**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA**

JAMIE K. SANDERS,                          )
                                           )
                    Plaintiff,             )
                                           )
v.                                         )          Case No. 03-CV-0452-CVE-FHM
                                           )
SOUTHWESTERN BELL TELEPHONE, L.P.,  )
                                           )
                    Defendant.             )

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

       This is an action by a former employee against her former employer for wrongful termination

on the basis of age, in violation of Oklahoma public policy.  The Court bifurcated liability from

damages, and a non-jury trial on liability only was held on August 13, 14, 17, and 18, 2009.  Having

considered the evidence and the submissions of the parties, the Court hereby enters its findings of

fact and conclusions of law:

**I.     FINDINGS OF FACT**[1]

       **A.     The Parties**

       1.       Plaintiff, Jamie K. Sanders, is a resident of Edmond, Oklahoma.  Pretrial Order, Dkt.

# 342, at 4.  Her year of birth is 1954.  Id.  Plaintiff was employed by defendant, Southwestern Bell

Telephone, L.P. (SWBT), from January 1980 until December 2002.  See Plaintiff's Ex. 43, at 2.

       2.       SWBT was, at all times relevant to this case, a corporation doing business in Tulsa,

Oklahoma.  Pretrial Order, Dkt. # 342, at 4.  On June 29, 2007, SWBT was converted to a Missouri

---

[1]      Any conclusion of law more appropriately characterized as a finding of fact is incorporated
         herein.

corporation.  Dkt. # 264.  The name of the new corporation is Southwestern Bell Telephone Company.  Id.

3.      SBC Communications, Inc. (SBC), now renamed AT&T Inc., was the parent company of SWBT.  SBC provided SWBT employees with a severance pay plan, benefits plan, and a disability plan, as well as plan documents.  See, e.g., Defendant's Exs. 50-51.  In addition, SBC provided other documents to SWBT, such as the EEO Policy and Code of Business Conduct.  See Defendant's Ex. 73.  Plaintiff initially named three defendants, including SWBT and SBC.[2]  Dkt. # 2.  On November 26, 2003, plaintiff filed one summons with a  return of service.  Dkt. # 6.  The summons is addressed to "Mary Marks Jenkins, Registered Service Agent, 800 N. Harvey Oklahoma City, Oklahoma."  Id.  The summons is defective because it does not identify which entity was being served.  The proof of service states that service was on "SBC," but the summons was delivered to Pam Mason, Legal Department for "Southwestern B" at 800 N. Harvey, Oklahoma City, Oklahoma. Id.  There is no evidence of record that Mary Marks Jenkins was ever the service agent for SBC or that Pam Mason in the SWBT legal department had the authority to accept service on behalf of SBC. SBC (and its successor AT&T Inc.) has no presence in Oklahoma and no registered agent for service of process in Oklahoma.  Threlkeld Affidavit, Dkt. # 312-2, at 2.  Counsel for defendant has always maintained that SBC was never properly served.  See, e.g., Dkt. # 7, at 1 n.1; Dkt. # 8, at 1 n.1; Dkt. # 10, at 1 n.1; Dkt. # 13, at 1 n.1; Dkt. # 130, at 1 n.1.  On July 27, 2006, the Court found that SBC had not waived service of process by counsel entering an appearance, see Dkt. # 5, and dismissed SBC as a party for plaintiff's failure to timely serve under Fed. R. Civ. P. 4(c)(1).  Dkt. # 152.  On

---

[2]      The third defendant was determined to be a non-existent entity and was dismissed.  See Dkt. # 152.  Sanders did not appeal this dismissal.

appeal, the Tenth Circuit held that the plaintiff should have been given prior notice before SBC was dismissed, and reversed the dismissal of SBC as a defendant, see Sanders v. Southwestern Bell Tel., L.P., 544 F.3d 1101 (10th Cir. 2008), and remanded on December 2, 2008 (Dkt. # 197).  Thereafter, plaintiff had more than eight months before trial to properly serve SBC.  Instead, on January 20, 2009, counsel for plaintiff, C. Rand Eddy, filed a Stipulation of Dismissal Without Prejudice (Dkt. # 204) of SBC.  At a hearing on June 1, 2009, plaintiff informed the Court that her attorney filed that dismissal without her approval.  During the hearing, however, plaintiff agreed to dismiss SBC, and thereafter on June 5, 2009, filed a notice (Dkt. # 244) consenting to the dismissal of SBC with prejudice.  The Court entered an order (Dkt. # 246) dismissing SBC with prejudice.  However, on June 23, 2009, plaintiff changed course and sent a letter to the Court seeking to withdraw that dismissal of SBC, docketed as a motion to vacate (Dkt. # 279), which is pending.  On July 28, 2009, SWBT filed an affidavit (Dkt. # 312-2) stating that it was the employer of plaintiff and has sufficient assets to pay any judgment.[3]

---

[3]     Regardless of whether SBC is a party, the Court has considered all of the evidence relevant to plaintiff's age claim, regardless of whether the evidence originated with SWBT or SBC, which is what plaintiff's counsel requested.  See Tr. at 885-86.  [The trial transcript is in four volumes, one for each day of trial.  Volume I (8/13/09) is Dkt. # 360 (pages 1-243); Volume II (8/14/09) is Dkt. # 361 (pages 244-487); Volume III (8/17/09) is Dkt. # 362 (pages 488-744); and Volume IV (8/18/09) is Dkt. # 363 (pages 745-895).  All references to the trial transcript will be to the consecutively numbered pages as "Tr. at __."]

**B.     Procedural History of the Case**

4.      In 2003, plaintiff[4] filed a complaint and an amended complaint alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, et seq. (Title VII), the Age Discrimination in Employment Act (ADEA), and a state law Burk tort[5] claim.  Dkt. ## 1, 2.

5.      On January 28, 2004, the Court dismissed plaintiff's Burk tort claim on the ground that plaintiff had a federal remedy "which adequately protect[ed] the public policy Oklahoma has against . . . age discrimination."  Dkt. # 14, at 3.  On September 5, 2006, the Court entered summary judgment in defendant's favor on plaintiff's ADEA claim.  Dkt. # 175.

6.      Plaintiff appealed the Court's rulings on defendant's motion to dismiss and motion for summary judgment (Dkt. ## 186, 187).  In her Statement of Issues Presented for Review, plaintiff argued that since the time her Burk tort claim was dismissed, the Oklahoma Supreme Court's decision in Saint v. Data Exchange, Inc., 145 P.3d 1037 (Okla. 2006), "clarified the law and adopted the position [plaintiff] set out in [her] Response to the Defendants' Motion to Dismiss."  Brief of Appellants, Sanders, 544 F.3d 1101 (Dkt. # 1997773), 2007 WL 678181, at * 3.  Because of the intervening change in the law, plaintiff asked the Tenth Circuit to reinstate her Burk tort claim.  Id.

---

[4]     When this case was first filed, Sanders had two co-plaintiffs, Denise Coffey and Karie Brooks.  The Court entered summary judgment against Coffey and Brooks on all of their claims (Dkt. # 175), and that judgment was affirmed by the Tenth Circuit.  See Sanders, 544 F.3d 1101.

[5]     A "Burk" tort claim, referring to the case of Burk v. K-Mart Corp., 770 P.2d 24 (Okla. 1989), is a state tort claim based on a violation of Oklahoma public policy.  See infra.

7.     Defendant responded to plaintiff's <u>Burk</u> tort argument and asked the Tenth Circuit to deem it waived for inadequate briefing. Brief of Appellee, <u>Sanders</u>, 544 F.3d 1101 (Dkt. # 2018443), 2007 WL 1379308, at * 51.

8.     The Tenth Circuit affirmed this Court's ruling on plaintiff's Title VII claim, but reversed and remanded as to plaintiff's ADEA claim based on a genuine issue of material fact as to direct evidence of age discrimination. <u>Sanders</u>, 544 F.3d 1101.  However, the Tenth Circuit held that, while not explicitly abandoned, plaintiff's <u>Burk</u> tort claim was "waived due to inadequate briefing on appeal." <u>Id.</u> at 1104 n.3.

9.      This Court subsequently granted plaintiff's motion to reinstate her <u>Burk</u> tort claim (Dkt. # 218), and her motion to dismiss her federal ADEA claim with prejudice (Dkt. # 241).  Thus, the only claim at trial was plaintiff's <u>Burk</u> tort claim against SWBT.

**C.     Plaintiff's Employment History**

10.     Sanders was hired by SWBT as a Records Clerk on January 14, 1980.  Pretrial Order, Dkt. # 342, at 4; Sanders Testimony, Tr. at 667-68.  From 1982 to 1991, Sanders held secretarial and administrative positions in various departments at the company, including working as a records clerk and an assistant in "technial [sic] network operations financial."  Plaintiff's Ex. 18; Defendant's Ex. 108; Sanders' personnel file, Plaintiff's Ex. 19.  In several of those positions, Sanders supervised other employees. Sanders Testimony, Tr. at 675, 677-79.  From August 1991 to February 1992, she worked as a Manager - Financial, and supervised data entry clerks.  <u>Id.</u> at 680; Plaintiff's Ex. 18; Defendant's Ex. 108.

11.     Sanders took and passed the Engineering Selection Module (ESM) test.  Sanders Testimony, Tr. at 680.  According to Wooten, the ESM tests engineering aptitude through a series

of math and critical thinking problems.  Wooten Testimony, Tr. at 357; McNeely Affidavit, Plaintiff's Ex. 5, at 3.

12.     The Court finds that because the ESM measures aptitude and not performance, whether or not an employee took the ESM is not particularly relevant to his or her performance ratings or rankings.

13.     Sanders held the job title of Manager - Engineering Design from February 1992 until November 2002.  Sanders Testimony, Tr. at 681.  From 1992 until 1997 her duties included overseeing clerks who entered information into a database.  In February 1997, Sanders was transferred to Oklahoma Construction and Engineering (C&E).  Id. at 685-86; Plaintiff's Ex. 18; Defendant's Ex. 108.

14.     The C&E organization's purpose is to design and build outside plant networks. McNeely Testimony. Tr. at 203-04.  C&E has a director, area managers (second-line managers), and engineering design managers, contract coordinators, and construction managers (all first-line management positions).  Id.

15.     Sanders did not start design work until 1997.  Sanders Testimony, Tr. at 843-44; Vahle Testimony, Tr. at 541.

16.     Sanders received training from Paula Henderson in the field and then attended formal training in Irving, Texas.  Sanders Testimony, Tr. at 689.

17.     Sanders was supervised by Charlie Hamer from 1997 to 1999, Gary Wilson from 2000 to 2001, and Rick Wooten from 2001 to 2002.  Id. at 689-99.

18.     Sanders worked on high capacity lines (hi-caps) and wire centers. Id. at 690. At the end of 1999 she started training other engineers. Id. at 696. She taught them to measure cable, gauge cable, make field notes, and be aware of safety. Id. at 697-98.

19.     Sanders completed a basic cable splicing course in 2001. See Sanders' personnel file, Plaintiff's Ex. 19, at 31; Plaintiff's Ex. 51. Sanders also received a Bachelor of Arts degree from Oklahoma City University in 2001. Id.

20.     Sanders testified that when McNeely became the director of C&E in Spring 2001, she got a "feeling" that she "did not have long" at C&E. Sanders Testimony, Tr. at 712-13. She was unable to offer any facts to support this "feeling." Id.

21.     In early 2001, Sanders was staffed on the "demand team." Id. at 701. The demand team was created to handle short turn-around hi-cap orders for businesses. Wooten Testimony, Tr. at 264. Sanders' responsibilities on the demand team included developing and implementing processes, and training the demand team engineers. Sanders Testimony, Tr. at 701-02. Wooten testified, however, that Sanders did not "train" the new demand team engineers, as much as set up administrative procedures for a shared drive. Wooten Testimony, Tr. at 265; see Hawkins Deposition, Joint Ex. 1, Dkt. # 357, at 32.

22.     Kaylan Collins, a first line manager, testified that Sanders "trained" her and the other demand team members. Collins Testimony, Tr. at 250-57. According to Collins, approximately 90% of Sanders' time was spent on training. Id. at 258.

23.     According to Wooten, Sanders spent approximately 45 days getting the demand team off the ground; after the initial set up, Sanders spent very little time on the demand team. Wooten Testimony, Tr. at 267.

24.     Sanders testified that the bulk of her demand team work was completed in August or September 2001, and after that most of her work involved "tweaking" the shared drive.  Sanders Testimony, Tr. at 706-07, 845-46.

25.     By mid-2002, Sanders was not working on demand team responsibilities and was primarily responsible for working on wire centers.  Id. at 846.

26.     In the Fall of 2002, Sanders worked in the Bethany, Oklahoma office.  Pretrial Order, Dkt. # 342, at 4.  Her supervisor was Rick Wooten, who reported to Dan McNeely.  Id.

27.     Wooten, who became an Area Manager in December 2000, testified that he had a "good" relationship with Sanders and she was a "satisfactory" employee.  Wooten Testimony, Tr. at 263.  Sanders testified that she had a good working relationship with Wooten.  Sanders Testimony, Tr. at 712.

28.     On November 13, 2002, Sanders was notified that she was being surplussed, see infra, and on December 14, 2002, Sanders' employment with SWBT was terminated.  Sanders Testimony, Tr. at 710; Defendant's Ex. 45.  She accepted a position with an affiliate, SBC Internet Services (SBCIS) in Plano, Texas, at the same salary.  Sanders Testimony, Tr. at 725-26.

**D.     Code of Business Conduct**

29.     At all times relevant to this lawsuit, SWBT had in place a Code of Business Conduct that prohibited making employment decisions on the basis of age.  McNeely Testimony, Tr. at 206-09.  Employees receive a copy of the Code of Business Conduct annually, and are required to sign an acknowledgment that they have reviewed it.  Id. at 210.

8

### E.      Reductions in Force at SWBT

29.      Due to regulatory changes and an economic downturn, SWBT initiated a series of three reductions in force (RIF).  McNeely Testimony, Tr. at 52-54, 59-60, 211; Defendant's Ex. 1; Plaintiff's Ex. 14.  The surpluses took place in Fall 2001, Spring 2002, and Fall 2002.  Id.; Pretrial Order, Dkt. # 342, at 4.  After all three RIFs, fifty-five first-level managers had left the company. McNeely Testimony, Tr. at 211.   In the Fall 2002 RIF, twenty-two first-line managers were surplussed.  Id. at 195, 212; Saenz Affidavit, Plaintiff's Ex. 4.

30.      The SWBT managers involved in the Fall 2002 RIF included Daniel C. McNeely, Director of Oklahoma Construction and Engineering (C&E) (year of birth 1948) and Area Managers Rick Wooten (year of birth 1959), Mike Harris (year of birth 1952), Amy Elliot (year of birth 1959), Karl Vahle (year of birth 1951), and Rick Griffith (year of birth 1952).  Pretrial Order, Dkt. # 342, at 4; Defendant's Ex. 121A.

31.      McNeely expressed shock and Wooten expressed disappointment over the Fall 2002 RIF, and having to let first-line managers go.  McNeely Testimony, Tr. at 212; Wooten Testimony, Tr. at 439.

32.      McNeely, who became director of C&E in Spring 2001, testified that each RIF was handled differently.  McNeely Testimony, Tr. at 53-54.  For the Fall 2001 and Spring 2002 RIFs the managers were ranked on a statewide basis, which resulted in an imbalance of managers in certain locations and required him to transfer several managers between offices.  Id. at 53-54, 214.

33.      Starting in 2001, McNeely had his Area Managers include the following terminology in their comments section of the performance evaluation:  superior, above average, no comment,

below average.  McNeely Testimony, Tr. at 90, 94-95.  This was the first time that these criteria were used in performance evaluation comments.  Id. at 95; Vahle Testimony, Tr. at 534.

34.     Plaintiff's counsel continually suggested that the use of terminology such as "superior" and "above average" was somehow "magic" or "secret code."  Tr. at 94-95, 311-14, 857-58, 862.  The Court finds that there is nothing mysterious about rating employees, as they compare to their peers, as superior, above average, average, or below average, and the use of such terminology is not circumstantial evidence of age discrimination.

35.     Karl Vahle, a Tulsa-based Area Manager in Construction Engineering, testified that for the Spring 2002 RIF the Area Managers were instructed to rate their first-line managers on the basis of managerial and technical skills.  Vahle Testimony, Tr. at 514, 578-79.  Managers were awarded zero, five, or ten points for their managerial skills and either zero or five points for technical skills.  Id. at 516, 579. A manager would get a zero if he or she had average technical skills and a five for skills that were "above and beyond" the skills necessary to perform his or her job function.  Managers also received points for being promotable, and for their level of education.  Id. at 517. Area Managers were not responsible for adding the points for education, and Vahle presumed that information came from the employee's personnel file.  Id.

36.     The process for the Spring 2002 RIF was as follows:  Area Managers had a meeting with McNeely where he announced that there would be a surplus, a second meeting was held to explain the process, and Area Managers filled out the rating forms and sent them back to McNeely.  Vahle Testimony, Tr. at 518-20.  McNeely testified that his secretary took the ratings, added the points, and compiled a list for him.  McNeely Testimony, Tr. at 117.  Finally, Area Managers

received a list of the employees in the state and their rankings so they could tell their employees who would be laid off.  Vahle Testimony, Tr. at 520.

37.     The Spring 2002 ratings were based on the 2001 performance evaluations.  Wooten Testimony, Tr. at 298; McNeely Testimony, Tr. at 83.  The performance evaluation was an annual appraisal and was a collaborative effort between the Area Manager and the manager being evaluated where the two could set goals and objectives for the year.  McNeely Testimony, Tr. at 83-85.  The performance evaluation was a living document that was to be updated throughout the year.  Id. David Boleman, McNeely's predecessor, testified that both subjective and objective factors play a role in a performance evaluation, but "we've been trained to rely predominantly on objectivity."[6] Boleman Testimony, Tr. at 868.

38.     Following the Spring 2002 RIF, several first line managers were subject to "realignment within the district."  July 2002 announcement, Plaintiff's Ex. 54/Defendant's Ex 90. Ronald McDonald, John Starwalt, Stephen Mathes, and Butch Miller all changed supervisors.  Id.; Sanders Testimony, Tr. at 794-97.  To the extent that plaintiff suggests that younger managers were moved to "safe locations" to avoid the Fall 2002 RIF, the Court finds that was not the case.  First, Jeanne Frailey, Associate Director - Human Resource Planning and Communication for SBC Services, Inc., testified that if a business unit was attempting to manipulate the process she would not "stand for it" and if she suspected such conduct she would have questioned the unit trying to

---

[6]        In response to questions from plaintiff's counsel, Boleman testified that after a round of voluntary departures from C&E, he and his second-line managers discussed replacing those managers to replenish the workforce and develop employees for the future of the industry. Age was discussed in the context of bringing in some younger engineers to develop for the future.  Boleman Testimony, Tr. at 870-72.  The Court does not find that a discussion of replenishing the workforce is evidence of age discrimination; in any event, the discussion was not part of the Fall 2002 RIF.

engage in manipulation.  Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 72.  Further, McNeely testified that he was shocked when the Fall 2002 RIF was announced because the organization had just gone through two RIFs.  McNeely Testimony, Tr. at 212-13.  Managers could not have been moved in anticipation of the Fall 2002 RIF because it was not anticipated.

### F.    The Fall 2002 Reduction in Force

39.    In mid-September 2002, McNeely learned that a third RIF was to occur.  Id. at 54, 212.  McNeely testified that he was shocked because there had just been two RIFs.  Id. at 59, 212. In preparation for the Fall 2002 RIF, McNeely was asked to participate in a conference call with the SWBT Vice President and several Assistant Vice Presidents.  Id. at 54-55.  On that call, McNeely was given a head-count for reduction numbers, which was twenty-two first-level managers and one area manager.  Id. at 54-56, 61, 212.  The Vice President reinforced that this was to be a performance-based reduction.  Id. at 57-58, 61.

40.    For the Fall 2002 RIF, the managers were ranked by geographical area, and not on a statewide basis.  Id. at 58, 61, 213.  The reason for the geographical approach was to avoid relocations after the RIF.  Id. at 58, 61, 213; Vahle Testimony, Tr. at 581.

41.    The Court finds that the purpose of the prohibition on relocation was to avoid circumventing the RIF by juggling employees between locations; employees had to be eliminated.[7]

42.    The week after the initial conference call, McNeely had a second call with upper management in which he received more detail on how to apply the Management Staffing Guidelines

---

[7]    McNeely testified that, following the Spring 2002 RIF, he moved an engineer, Tim Scott, to Tulsa because of a shortage of engineers in Tulsa.  McNeely Testimony, Tr. at 114-15; McNeely Affidavit, Plaintiff's Ex. 5, at 3.  He did not move anyone in the Fall 2002 RIF. McNeely Testimony, Tr. at 115.

(MSGs) to the Fall 2002 RIF. McNeely Testimony, Tr. at 62, 214-15; October 2002 MSGs, Plaintiff's Ex. 1/Defendant's Ex. 2. The MSGs outlined the procedures for conducting the Fall 2002 RIF. McNeely received the MSGs from Human Resources or from someone in his chain of command. McNeely Testimony, Tr. at 215; see also Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 18 (Corporate HR established the guidelines and communicated those to the local business units). McNeely described the MSGs as "overarching guidelines" for the Fall 2002 RIF. McNeely Testimony, Tr. at 68, 215; see also Saenz Affidavit, Plaintiff's Ex. 4, at 2.

43.     The MSGs, which include the steps for evaluation of managers, provide that: "Criteria such as performance, skills, experience, and training [PSET], remain key to the selection of managers for staffing the organization." October 2002 MSGs, Plaintiff's Ex. 1/Defendant's Ex. 2, at 9, ¶ 12.1; see also Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 107. The MSGs further provide the following steps for evaluation to be followed and documented as indicated:

> 1. Those managers in an affected work group potentially subject to being declared surplus should be selected **based on criteria such as performance, skills, experience and training**. Initially, employees should be assigned to one of the following four bands:
> Band A – Managers exceeding expectations
> Band B – Managers meeting expectations
> Band C – Managers meeting some expectations
> Band D – Managers not meeting expectations (Participation in a Performance Improvement Plan is not required).
> Managers should be listed in order from high to low based upon criteria such as performance, skills, experience and training **only if the number of surplus positions meets or exceeds the number of managers assigned to that band, beginning with the lowest band**.

October 2002 MSGs, Plaintiff's Ex. 1/Defendant's Ex. 2, at 9, ¶ 12.2 (emphasis in original).

44.     According to Frailey, the MSGs "purposefully" do not define the PSET criteria because "business circumstances are different in . . . different business units." Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 36. Rather, the second and third-line managers in charge of evaluating

13

the first-line managers were to work with their Human Resources manager and determine the "best way of assessing employees within their organization, taking into account their business needs and . . . within the provisions of the staffing guidelines." Id.

45.     In mid-September, 2002, McNeely and his Area Managers had a conference call in which McNeely advised them of the upcoming RIF.  McNeely Testimony, Tr. at 63; Wooten Testimony, Tr. at 284, 445; Vahle Testimony, Tr. at 520.

46.     Wooten testified that after that call he developed four or five different proposals depending on how many people would have to be surplussed.  All of the managers in Wooten's proposals were design engineer managers; Wooten managed design engineers and one operations clerk.  Wooten Testimony, Tr. at 284-85, 444.

47.     McNeely then asked his Area Managers to meet on a Saturday to discuss small geographic areas in which to reduce force.  McNeely Testimony, Tr. at 63-65, 213.  The Tulsa Area Managers Vahle, Ray Hanson and Ray Strunk met in McNeely's office, and the Oklahoma City Area Managers Amy Elliott, Mike Harris, Wooten and Griffith were on the phone.  Vahle Testimony, Tr. at 521.

48.     Vahle testified that the geographic groupings were done by job title and geographic area, with the understanding that there were to be no relocations to satisfy the surplus.  Id. at 522-23, 581.  McNeely testified that he looked for areas where they could "do more with less."  McNeely Testimony, Tr. at 63.

49.     It was decided that some areas of Oklahoma would be "carved out" of the RIF, and managers in those areas would not be impacted.  Id. at 75.  Two areas that were carved out were Clinton, Oklahoma, a small town with only one manager, and the Construction Management Center

(CMC) in Tulsa. Id. Six managers worked out of the CMC. Id. Those two areas were carved out because SWBT could not afford to lose any managers in those areas. Id. at 75-76.

50.     According to McNeely, all engineering design managers were pooled together, including the managers responsible for hi-caps, because the skill sets were the same. Id. at 74-76, 80.

51.     The Court finds nothing improper in the way employees were grouped for the RIF. The geographic and job title groupings are not evidence of age discrimination.

52.     After the geographic areas were determined, McNeely gave his Area Managers the performance evaluation ratings from the Spring 2002 RIF and asked them to update the ratings as needed. Id. at 80-82, 96-97, 99-100, 217; Wooten Testimony, Tr. at 445; Vahle Testimony, Tr. at 534; see, e.g., Defendant's Exs. 8 and 10.

53.     For the Fall 2002 RIF, the comments on the most recent performance evaluations were used to place managers into one of four Bands:  A, B, C, or D.  McNeely Testimony, Tr. at 81-83. The A Band corresponded to what would have been a 40 rating in the previous RIFs, B corresponded to a 30, C to a 20, and D to a 10. Id.  According to McNeely, Band placement was based on performance. Id. at 82, 102, 132.  The remaining PSET categories were used for ranking within the Band. Id. at 82-83, 102, 136-37.

54.     When asked how productivity factored into the ratings and rankings, McNeely testified that productivity is a component of performance. Id. at 159.  McNeely declined to define productivity for design engineers, and stated that he defers to his Area Managers to evaluate productivity. Id. at 159-61, 163-64. However, McNeely said that a better measure than productivity is "effectiveness." Id.  at 161-64.

15

55.     Wooten testified that he used production reports, titled the OK West Engineering Production Report, see, e.g., Plaintiff's Ex. 53, as a "tool" to balance the workload in his group. Wooten Testimony, Tr. at 268-69. Those production reports, coupled with other information, helped Wooten determine whether an employee was over-worked or in need of additional work. Id. There is nothing on the performance appraisal that correlates to the numbers on the production report and the other Area Managers did not generate or use such reports. See Vahle Testimony, Tr. at 560; Griffith Testimony, Tr. at 632.

56.     The Court finds that Wooten's production reports were not the basis for evaluating "productivity;" rather, they were used as a staffing tool.  Merever, the Court finds that there is no evidence that Wooten used the reports to rate his employees, and the ratings were not based on productivity alone, but on performance and the other PSET categories.

57.     Wooten testified that, pursuant to McNeely's directive, he reviewed his most recent performance ratings and made one change: he moved Alvin Breitling from a 20 rating to a 30 rating (Band C to Band B). Wooten Testimony, Tr. at 301; Plaintiff's Ex. 70, at 1; see Plaintiff's Ex. 8, at 9.  Wooten decided to change Breitling's rating because Breitling was the only manager in his location, and he was responsible for a vast geographic area.  In addition, Wooten believed that Breitling had developed into a competent engineer.  Wooten testified that his decision was not solely based on Breitling's production.  Wooten Testimony, Tr. at 302.

58.     Vahle and Griffith testified that they did not make any revisions to the Spring 2002 performance ratings.  Vahle Testimony, Tr. at 539; Griffith Testimony, Tr. at 622.

59.     According to the MSGs, it was only necessary to rank the employees in a potentially affected Band.  Plaintiff's Ex. 1/Defendant's Ex. 2; Saenz Affidavit, Plaintiff's Ex. 4, at 2.  The

16

managers in Oklahoma City/Stillwater were ranked in Bands A, B, and C; there were no employees in Band D.  McNeely Testimony, Tr. at 100-01.  It was determined that four design engineering managers in Oklahoma City were to be surplussed.  Saenz Affidavit, Plaintiff's Ex. 4.  There were a sufficient number of Band C managers to satisfy the surplus.  Accordingly, the Band C managers in the Oklahoma City/Stillwater geographic area were ranked from highest to lowest.  Id. at 2; Defendant's Ex. 12.

60.    McNeely prepared a document entitled "Ranking Considerations," to assist his Area Managers in ranking the managers.  McNeely Testimony, Tr. at 124-25; Plaintiff's Ex. 3/Defendant's Ex. 4.  The Ranking Considerations sheet lists each of the PSET categories, and suggests sub-categories. Plaintiff's Ex. 3/Defendant's Ex. 4.  Area Managers were to consider whether the manager's performance exceeds expectations, meets expectations, meets some expectations, or does not meet expectations.  Id.  Under skills, the managers' management, technical, and supervisory skills were to be considered, along with their effectiveness with others, "ability to handle broader scope," and possibility for promotion.  Id.  For experience, they were to consider the manager's NCS date[8] and equivalent work experience outside SWBT.  Finally, formal company training, technical or trade school, and level of higher education were to be considered.  Id.  Frailey testified that the Ranking Considerations were "consistent with the [MSGs]."  Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 39.

61.    According to Wooten, the direction from McNeely was to keep the best people possible.  Wooten Testimony, Tr. at 322.  The emphasis for the Fall 2002 RIF was performance;

---

[8]    NCS is an acronym for Net Credited Service and can mean the employee's start date with SWBT.

17

skills, experience, and training were used to "break the tie."  McNeely Testimony, Tr. at 102; Wooten Testimony, Tr. at 327.

62.     The Court finds nothing improper in the criteria by which employees were to be ranked.  The PSET categories and McNeely's ranking considerations are not evidence of age discrimination.  To the contrary, they are evidence that the rankings were to be based on legitimate business considerations.  Further, the fact that the process and ranking considerations for the Fall 2002 RIF differed from that of previous RIFs is not evidence that the Fall 2002 RIF was manipulated or somehow tainted.

63.     McNeely did not attend the Area Manager meeting, which was held on September 26, 2002. McNeely Testimony, Tr. at 150-51, 155; Wooten Testimony, Tr. at 320-21.  In attendance were Wooten, Vahle (via telephone from Tulsa), Amy Elliott, Rick Griffith, and Mike Harris. Wooten Testimony, Tr. at 320.  The meeting was held at 6100 South Walker in Oklahoma City.  Id. at 321.

64.     Wooten and Vahle testified that they discussed performance, education, experience and background at the company, and skills.  Wooten Testimony, Tr. at 326; Vahle Testimony, Tr. at 540-41.  According to Wooten, much of the discussion was on technical skills, which, in Wooten's opinion, was one of the most important aspects of the job.  Wooten Testimony, Tr. at 327. Vahle agreed that retaining managers with technical skills would give the company more flexibility in its staffing decisions.  Vahle Testimony, Tr. at 550-51.  Griffith testified that outside plant experience greatly assisted in design engineering, and was a ranking consideration.  Griffith Testimony, Tr. at 648.  In her deposition, Frailey stated that the business units were to consider all of the PSET categories, but "different factors may weigh more heavily in different business units."

18

Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 35.  For example, if a business unit "elected to put more emphasis on performance, then the business unit would have the latitude to do that because they are the only ones that know their business needs and the structure of their organization." <u>Id.</u> at 121.  Plaintiff suggests that it was somehow improper for SWBT to have decided that technical skills would be important in deciding which employees to retain.  In effect, plaintiff is asking the Court to substitute its business judgment for that of the Area Managers making the ranking decisions.  That is not a proper role for the Court; its role is to determine if there is proof of age discrimination.  Further, emphasizing technical skills is not evidence of age discrimination.

65.     The meeting lasted all day, and the Area Managers agreed that the decision would have to be unanimous.  Wooten Testimony, Tr. at 333, 388; Griffith Testimony, Tr. at 624; Vahle Testimony, Tr. at 546; Harris Affidavit, Plaintiff's Ex. 10, at 3.  Vahle testified that there were no other agreements prior to the meeting.  Vahle Testimony, Tr. at 546.

66.     At the meeting, the names of the managers were written on a white board and each was discussed and ranked.  Wooten Testimony, Tr. at 330.  According to Wooten, it was a small work group and all of the Area Managers had some familiarity with each of the first-level managers. <u>Id.</u>  Griffith testified that the Area Managers in charge of construction teams, himself and Mike Harris, each had counterparts who supervised design engineers.  Griffith Testimony, Tr. at 651-52. Accordingly, the construction managers were familiar with the work of the design engineers being ranked, even though they did not have direct reports who were being ranked at this meeting.  <u>Id.</u> at 652.  Griffith's counterpart was Amy Elliot and Wooten's counterpart was Mike Harris.  Vahle did not have a counterpart because he supervised the hi-cap team.  <u>Id.</u>

67.     Wooten testified that he took notes at the meeting, and recorded the final ranking on an engineer's folder.  Plaintiff's Ex. 9.  After the meeting he made notes on his ranking sheet regarding his Enid and Lawton managers, despite the fact that Enid and Lawton were not discussed at the ranking meeting.  Wooten Testimony, Tr. at 331, 342; Plaintiff's Ex. 9.

68.     Wooten noted various information about the managers, including which managers had Bachelor's Degrees.  Wooten Testimony, Tr. at 335-36. Wooten had a list of the managers with degrees, but he did not bring the list to the meeting that day.  Id. at 337.

69.     Wooten also testified that he "guesstimated" which employees might be pension-eligible,[9] and marked those names with an asterisk.[10]  Id.  at 340-41.  Wooten turned out to be wrong about several of the managers that he listed as pension eligible.[11] Id. at 469. Wooten stated that he did not share his thoughts on pension eligibility with the other Area Managers and there was no discussion of pension eligibility at the meeting.   Id. at 340-41.   Vahle testified that retirement eligibility would not have been relevant to their discussion.  Vahle Testimony, Tr. at 548.

---

[9]     An employee is pension eligible based on a modified rule of 75:  50 years of age plus years of service must equal 75, or the employee must have 30 years of service, regardless of age. Thus, pension eligibility is not the same as age.

[10]     The Court notes that Sanders' name does not have an asterisk next to it.

[11]     Sanders argues that it is implausible that Wooten would not know the exact ages of his "good friends" and co-workers, and that his testimony is, therefore, not credible.. Dkt. # 371, at 18.  The Court finds it plausible that Wooten did not know other employees' exact ages, and the fact that Wooten was incorrect about pension eligibility supports this determination.

70.     Wooten testified that he hoped that some of the pension eligible managers would take the "Interest in Leaving,"[12] see Defendant's Ex. 42, so they could avoid surplussing anyone. Wooten Testimony, Tr. at 341.

71.     Vahle testified that he generally knew how many years of service his employees had, but he did not share that information at the meeting.  Vahle Testimony, Tr. at 547.

72.     Griffith testified that the Area Managers had an organizational chart with the first-line managers' NCS dates, but an NCS date does not necessarily correlate to someone's age.[13]  Griffith Testimony, Tr. at 637; see, e.g.,  Defendant's Exs. 111-12.

73.     According to McNeely, Area Managers should not discuss protected status, such as age, gender, race, in a ranking meeting.  McNeely Testimony, Tr. at 158.  Wooten, Vahle, and Griffith all testified that the Area Managers did not discuss age, retirement status, or pension eligibility at the meeting on September 26, 2002.  Wooten Testimony, Tr. at 353-54; Vahle Testimony, Tr. at 547-48; Griffith Testimony, Tr. at 640-41.

74.     The Area Managers ranked seventeen managers in the Oklahoma City/Stillwater geographic area.  Ranking sheet, Defendant's Ex. 12.  Vahle testified that the Area Managers did not decide who would be surplussed, they just ranked the employees from one to seventeen.  Vahle Testimony, Tr. at 562.

---

[12]     According to the MSGs, "Business Units with a surplus situation may elect to incorporate consideration of the "Interest in Leaving" survey form . . . ."  October 2002 MSGs, Plaintiff's Ex. 1/Defendant's Ex. 2, at 9 ¶ 12.1.

[13]     Griffith testified that in his deposition he stated that he had seen an organizational chart with employee ages.  Griffith Testimony, Tr. at 638-40.  At trial he testified that he had been mistaken, and the chart listed NCS dates, and not dates of birth.  Id. at 640.  The Court finds Griffith's testimony that he was mistaken to be credible.

75.     Cecil Sharp was ranked number one, followed by John Peters, Garyle Harline, Joe Coleman, Steve Mathes, and Michael Heatley.  Ranking sheet, Defendant's Ex. 12.  Mike Harris stated that Sharp had more engineering experience and a higher skill level than Sanders.  Harris Affidavit, Plaintiff's Ex. 10, at 4.  Peters had construction experience and Harline had a "civic engineering background;" both were considered more versatile than Sanders.  Id.  Coleman had more experience and a higher skill level than Sanders, and Mathes had experience in installation and repair and construction.  Id.  Finally, Heatley had outside technical experience and had a higher skill level than Sanders, despite not having been an engineer for as long as Sanders.  Id.  Butch Miller was ranked ahead of Sanders because of his outside construction background.  Id.  Sharp, Peters, Harline, and Coleman were all older than Sanders;  Mathes was one year younger and Heatley was two years younger than Sanders.  Defendant's Ex. 121A.

76.     Wooten testified that the names were moved around before a final ranking was reached.  For example, Lynch was initially ranked ahead of Sanders, but was moved below her because his Area Manager reported that Lynch had a bad attitude.  Wooten Testimony, Tr. at 332-33; Harris Affidavit, Plaintiff's Ex. 10, at 5.

77.     The Court finds that the fact that the rankings were adjusted after further discussion among the Area Managers evidences that the SWBT Area Managers took the task of ranking seriously, and gave each candidate fair consideration.

78.     When the rankings were completed, the Area Managers sent them to McNeely.  McNeely Testimony, Tr. at 219;  Wooten Testimony, Tr. at 389.

79.     McNeely testified that he was not given information about the ages of the seventeen managers, did not discuss age, and had no reason to believe that age had anything to do with Sanders' ranking.  McNeely Testimony, Tr. at 220-21.

80.     The Court finds the testimony of Wooten, Vahle, and Griffith about the discussion at the Area Manager meeting credible.  All three testified that the Area Managers considered each of the PSET criteria and followed the Ranking Considerations issued by McNeely.  Further, all three were credible in their testimony that they did not discuss employees' ages at the ranking meeting.

81.     Sanders was placed in Band C on the basis of her 2001 performance evaluation.  See Plaintiff's Ex. 51.  In Wooten's opinion, he did not need to update Sanders' rating for the Fall 2002 RIF.  Wooten testimony, Tr. at 292-93, 301; see Sanders' personnel file, Plaintiff's Ex. 19; Sanders' 2002 performance evaluation, Defendant's Ex. 70.

82.     At the Area Manager meeting on September 26, 2002, the conversation about Sanders included a discussion of her technical skills, which were considered primarily administrative, and comments that she lacked the ability to go into the field by herself.  Wooten Testimony, Tr. at 455.  Griffith also recalled hearing comments about Sanders from the field.  Griffith Testimony, Tr. at 635-36.  Vahle testified that he knew Sanders from work he had done with her in the past.  Vahle Testimony, Tr. at 541.   He recalled discussing Sanders' skills, background and experience, performance in her present job, and potential for growth as an engineer.  Id.  According to Vahle, Sanders' skills were more administrative and she lacked field outside experience.  Id. at 544.  Harris, in his affidavit, stated that Sanders' ranking was "primarily attributable to her non-technical background."  Harris Affidavit, Plaintiff's Ex. 10, at 4.

83.     The Area Managers also talked about Sanders' level of education, which was higher than some of the other managers.  Wooten Testimony, Tr. at 456; Vahle Testimony, Tr. at 541-42. Griffith recalled learning at that meeting that Sanders had completed her college degree and that she attended training to learn to read work prints.  Griffith Testimony, Tr. at 636.

84.     Vahle also testified that he thought that Mike Harris made comments that Sanders' work caused productivity problems for the outside plant engineers who had to build the jobs that Sanders designed.  Vahle Testimony, Tr. at 564.  Harris would have known this because he supervised the outside engineers who worked on Sanders' projects.  Id.

85.     Griffith testified that he recalled hearing concerns that Sanders was apprehensive about going into the field by herself, was not sure enough of herself to go and look at the problem, and that she was difficult to reach.  Griffith Testimony, Tr. at 635-36.

86.     When the rankings were finalized, Sanders was ranked 13 of 17, which was fifth from the bottom. McNeely Testimony, Tr. at 220; see Defendant's Ex. 12.  At the time, Sanders was not at-risk for surplus because only four managers were expected to lose their jobs.  Wooten Testimony, Tr. at 456-57; McNeely Testimony, Tr. at 229; Vahle Testimony, Tr. at 570.

87.     At the time the Area Managers were ranking the first-line managers, McNeely was ranking the Area Managers.  McNeely Testimony, Tr. at 152, 155.  One Area Manager was to be surplussed in the Fall 2002 RIF.  Id. at 151, 222.

88.      In October 2002, an addendum to the MSGs was issued, which stated that a higher-level manager could be considered for a lower-rated management position.  McNeely Testimony, Tr. at 132-33, 223; Wooten Testimony, Tr. at 390; October 2002 addendum to MSGs, Plaintiff's Ex. 2; Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 25.  For example, a second-line manager could take

a lower position if that manager had the "skills and experience and training necessary to perform the first-level job." Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 27-28.  According to McNeely, this policy was company-wide.  McNeely Testimony, Tr. at 133-34; Frailey Deposition, Joint Ex. 3, Dkt. # 359 at 25-26.

89.     After this document was released, on a conference call for another purpose, McNeely told his Area Managers that they would have the option of being considered for a lower-rated management position before he determined which Area Manager was to be surplussed.  McNeely Testimony, Tr. at 224; Griffith Testimony, Tr. at 604.

90.     Rick Griffith, an Area Manager in Oklahoma City, told McNeely that he was interested in being considered for a lower-rated management position, specifically a manager- design engineering in Oklahoma City.  McNeely Testimony, Tr. at 148, 224; Griffith Testimony, Tr. at 607. Griffith had 32 years of service at SWBT including cable splicing, construction, and design.  Griffith Testimony, Tr. at 647.  While Griffith had worked as both a design and construction manager in the past, he was more comfortable with the possibility of returning to the design engineer's position. Id. at 612. Griffith testified that he did not know about the possibility of stepping down at the time of the Area Manager meeting on September 26, 2002.  Id. at 606.

91.     McNeely called Wooten, Griffith's former supervisor from when Griffith was a design engineer.  McNeely Testimony, Tr. at 149, 225-26.  Wooten told McNeely that Griffith was a good design engineer and would have been placed in Band A or B.  McNeely Testimony, Tr. at 149-50, 226; Wooten Testimony, Tr. at 457.  Griffith was considered to be the "full package." McNeely Testimony, Tr. at 226-27; see Wooten Testimony, Tr. at 457.

25

92.     McNeely called his boss, Lorri Tener, and told her that Griffith wanted to be considered for a lower-rated management position, and McNeely thought that Griffith was qualified to do so. McNeely Testimony, Tr. at 226. Tener concurred with McNeely's decision, and Griffith's first-line manager position was approved. Id.

93.     Wooten and Vahle testified that they learned in October, several weeks after the ranking meeting, that Griffith was taking a first-line manager position. Wooten Testimony, Tr. at 457; Vahle Testimony, Tr. at 571. Wooten subsequently learned that Griffith's lower position would impact the Oklahoma City managers. Wooten Testimony, Tr. at 390. Vahle testified that a fifth manager became "at risk" because Griffith took a lower position. Vahle Testimony, Tr. at 570-71. Sanders was the manager ranked fifth from the bottom and, as a result, she became at risk after Griffith took the lower position. Wooten Testimony, Tr. at 347-48, 390, 456.

94.     On or about November 12, 2002, the Area Managers received the packets to give to the employees who were to be surplussed. Wooten Testimony, Tr. at 391. The packets included a surplus notification letter (Defendant's Ex. 47/Plaintiff's 11), an employee support package, a general release and waiver, and ADEA information (Defendant's Ex. 53/Plaintiff's Ex. 4, at 71). The company was required by law to provide the ADEA information to managers or employees when they were being surplussed. Frailey Deposition, Joint Ex. 3, Dkt. # 359.[14] Frailey testified that the ADEA listing is developed after the employees to be surplussed have already been determined; it does not "impact" the surplus. Id. at 85.

_____

[14]     The Older Worker's Benefit Protection Act (OWBPA) requires employers to give information about the ages of employees who are selected and not selected for participation in a benefits plan when discharging an employee. See 29 U.S.C. § 626(f)(1)(H).

26

95.    On November 13, 2002, employees selected for surplus were notified.  They were given several options: take 30 days to look for a new job on Career Path, see, e.g., Defendant's Ex. 106; take severance immediately; or take severance at any time during the 30-day period.  Wooten Testimony, Tr. at 462; October 2002 MSGs, Plaintiff's Ex. 1/Defendant's Ex. 2, at 13.

96.    In total, Wooten had to hand out five surplus packets, including one to Sanders. Wooten Testimony, Tr. at 398.   Wooten testified that the surplus meetings were short (approximately 5-7 minutes) and were "unpleasant" for both parties.  Id. at 400.  He followed the script provided to him, and handed out the letter and packet.  See Sample script for handling a surplus notification discussion, Defendant's Ex. 46; Wooten Testimony, Tr. at 398.  According to the script, surplussed employees are told that "[i]nformation required by the [ADEA]" is attached in order to "assist with this decision."[15]  Sample script, Defendant's Ex. 46.  Wooten testified that he spent approximately 20-30 seconds reviewing the ADEA information with each surplussed manager.  Wooten Testimony, Tr. at 467.  Wooten testified that he did not go off script, nor did he answer questions during these meetings.  Id. at 399.

97.    The Court finds it credible that Wooten followed the script during the surplus notification meetings.

98.    The Court further finds that SWBT complied with MSG ¶ 15.4 (Plaintiff's Ex. 1/Defendant's Ex. 2, at 13) by providing to the surplussed employees ADEA information along with the surplus notification letter.  The Court finds that this suggests that SWBT was doing all in its power to comply with the ADEA, thus showing it did not act with discriminatory intent.

---

[15]    Although plaintiff's counsel made much of the fact that Griffith was not on the ADEA list, the Court finds that Griffith did not appear on the ADEA list because he was not surplussed.

99.     Wooten testified that he was disappointed that any of his employees had to be surplussed, but he was not surprised or "shocked."  Wooten Testimony, Tr. at 392.  Wooten was involved in the ranking process, knew that Sanders was ranked in the bottom five, and knew that after Griffith stepped down the bottom five managers in Band C would be surplussed. Id. at 468.

### E.      Direct Evidence of Age Discrimination

100.    Sanders testified that she "knew what was going to happen" because several days before the surplus Wooten had a conversation with her about how difficult it would be to surplus a friend.  Sanders Testimony, Tr. at 714.

101.    Wooten testified that he met with Sanders on November 13, 2002.  Wooten Testimony, Tr. at 460-61.  He sat on the edge of the desk and Sanders sat on a chair, but he did not recall what Sanders was wearing that day.  Id.  Wooten testified that, other than perhaps asking Sanders to close the door, he followed the script.  Id.  According to Sanders, Wooten did not follow a script during the meeting.  Sanders Testimony, Tr. at 716.

102.    Sanders testified that she remained calm during the meeting because Wooten "had a tear in his eye" and she did not want to make him feel worse about surplussing her.  Id. at 714-15.  Wooten testified that Sanders appeared disappointed, but did not recall seeing tears in her eyes.  Wooten Testimony, Tr. at 406.

103.    According to Sanders, Wooten told her that in order to prevent discrimination there was an ADEA sheet, which he pointed to and said "There's your age."  Sanders Testimony, Tr. at 715.  She asked, "You're telling me I that I'm being surplussed because of my age?" and he nodded his head and said yes.  Id.  Wooten denied that Sanders asked him whether her age (48) "got [her]."  Wooten Testimony, Tr. at 403.

104.     According to Frailey, age was not a part of the surplus discussion and, to the extent that plaintiff had the impression that the ADEA listing reflected that age was part of the decision, that was "completely untrue."  Frailey Deposition, Joint Ex. 3, Dkt. # 359, at 88-89.

105.     Sanders testified that she asked Wooten whether her performance or productivity contributed to her surplus and Wooten replied that it was her age.  Sanders Testimony, Tr. at 717. Wooten did not recall Sanders asking him whether she was surplussed for her performance or productivity.  Wooten Testimony, Tr. at 467.

106.     Wooten denied telling Sanders that he "never expected to see her name on the packet," that it was the "hardest thing" he had ever done, or that he was "floored" when he opened the packet.  Id. at 402.  Finally, Wooten denied that Sanders asked him whether she was one of his bottom five managers.  Id. at 467.  He testified that he did not believe Sanders could have known that five of his managers were being surplussed because he never had a conversation with her about the number being surplussed or the rankings.  Id. at 467-68.

107.     Sanders testified that several times throughout the day on November 13, 2002, Wooten visited her in her cubicle and reiterated that she was surplussed because of her age.  Sanders Testimony, Tr. at 719, 847.  Wooten did not recall having another conversation with Sanders later that day.  Wooten Testimony, Tr. at 405.

108.     Sanders testified that during the 30-day period after she was notified that she was surplussed, Wooten repeatedly told her that it was her age, "but productivity was brought up" also. Sanders Testimony, Tr. at 816, 848.  Sanders testified that Wooten did not suggest that productivity was a problem from his perspective.  Id. at 817.

109.    Wooten did recall talking to Sanders during the 30-day period about possible jobs within the company.   Wooten Testimony, Tr. at 407.  He submitted her name for an OPTI manager position and talked to the OPTI manager about her.  Id.  Wooten thought that Paula Henderson got the OPTI job.  Id. at 408.  Wooten also testified that he told Sanders that she might be able to return to C&E in the future if a position for which she was qualified opened up.[16]  Id.

110.    Sanders' counsel attempted to impeach Wooten with an alleged conversation between Wooten and Hawkins.  Tr. at 439.  Wooten testified that he did not recall Rick Hawkins coming to his house that night, and he did not recall telling Hawkins that he was disappointed that Sanders was to be surplussed. Wooten Testimony, Tr. at 439-40.  Hawkins, in his deposition, testified that he did not recall going to Wooten's house the night before the surplus notices were given, or at any time in November 2002.  Hawkins Deposition, Joint Ex. 1, Dkt. # 357, at 5.

111.    Wooten further testified that he did not recall ever having a conversation with Hawkins about Sanders' surplus.  Wooten Testimony, Tr. at 424, 439, 441.  Hawkins remembered that Wooten was "shocked" about Sanders and it "hurt him" to have to tell her.   Hawkins Deposition, Joint Ex. 1, Dkt. # 357, at 5.  Even if true, these statements are not evidence of age discrimination.  Wooten's being hurt that he had to tell Sanders is consistent with her being surplussed because of legitimate business reasons.  Further, the Court finds it implausible that

---

[16]    In 2003, Sanders applied for a manager design engineering position under Wooten.  See Defendant's Ex. 106.  Wooten told her that she did not get the job because SBCIS would not release her.  Defendant's Ex. 107.  Wooten encouraged her to apply again in the future.  Id.

Wooten told Hawkins he was "shocked" about Sanders, because he participated in the rankings.[17]

112.    None of the Area Managers who testified were aware of a company policy that required three surplussed managers be interviewed for any open position.  See Plaintiff's Ex. 59; Wooten Testimony, Tr. at 410; Vahle Testimony, Tr. at 530; see also McNeely Testimony, Tr. at 199-200.

113. Sanders testified that she told Larry Higden, a third-line manager in a different division, about her conversation with Wooten; she "may have told" Sharon Andrews, Nancy Bounds, and Steve Koehn.  Sanders Testimony, Tr. at 720-21.

114.    Sanders recorded notes about her first conversation with Wooten in her log book (Plaintiff's Ex. 17).  She did not record any of the other conversations she alleges she had with Wooten on November 13, 2002.  Id.  Her log book makes no reference to any age-related statements by Wooten after November 13, 2002.  Id.

115.    The Court finds that Sanders' log book (Plaintiff's Exhibit 17) is not reliable.  On direct examination, Sanders testified that the log was written contemporaneously.  Sanders Testimony, Tr. at 708-09.  On cross-examination, defense counsel brought out the fact that on November 13, 2002, she supposedly wrote about an event that took place on November 14, 2002.  Sanders Testimony, Tr. at 849; see Plaintiff's Ex. 17, at pg. 3.  On re-direct examination, Sanders

---

[17]    Hawkins also testified that, in another conversation, Wooten told him that he had no input into who would be surplussed.  Hawkins Deposition, Joint Ex. 1, Dkt. # 357, at 6.  The Court finds that this conversation was likely unrelated to the Fall 2002 RIF, because Wooten would have no reason to lie about his involvement in the Fall 2002 RIF.  Further, even if it did take place after the Fall 2002 RIF, this alleged conversation does not cast doubt upon Wooten's testimony that he did not discuss Sanders' surplus with Hawkins, because there was no mention of Sanders in this conversation.

admitted that she later created the log from "scraps of paper;" thus, it was not contemporaneous. Sanders Testimony, Tr. at 850.

116.    The Court credits Wooten's account of his meeting with Sanders, including his denial of the statements that selection decisions were based on age.  He had a good recollection of the events and he was forthcoming about what he could and could not remember clearly.  On the contrary, Sanders' account of the meeting is simply implausible.  There is no reason why Wooten would have been surprised that Sanders was to be surplussed when he participated in the rankings, which were unanimous, and knew she was near the bottom.  Wooten knew that the rankings were based on the PSET categories and were not based on age.  Therefore, it is implausible that he would have told Sanders that she was surplussed because of age.  What is plausible, however, is that Wooten showed Sanders the ADEA information.  While the Court finds that Sanders mistakenly believes that her surplus had something to do with age, it is most likely that she mistook the ADEA information as a suggestion of age as a surplus factor.  It is indeed ironic that delivery of the very information required by the ADEA may have caused plaintiff's mistaken belief that age was a factor in the surplussing decision.

117.    The Court does not find credible Sanders' account of Wooten's statements after the November 13, 2002 meeting.  Wooten denies having made such statements.  Sanders' own log book does not reflect these statements.  Further, it is implausible that Wooten would have repeatedly and explicitly admitted to age discrimination.

118.    The additional credible evidence weighs against a finding of age discrimination.  The SWBT Code of Business Conduct prohibits making employment decisions based on age, and age was not a factor in determining who would be at risk for surplus or ranking employees.  Age was

not discussed at the ranking meetings.  It is unlikely that Wooten told Sanders, who was 48 years old at the time, that her layoff was based on age when it is undisputed that half of the managers who ranked above her were older.  In fact, the top four individuals in Band C were older than Sanders. Further, after Wooten and the other Area Managers labored over the final rankings, Sanders was not at risk for surplus.  Rather, it was the fortuitous event that Griffith accepted a lower position that Sanders even became surplus.  Based on the foregoing, the Court finds that Wooten did not tell Sanders that she was surplussed because of her age. The Court further finds that there is no other direct evidence that Sanders was surplussed because of her age.

**F.     Circumstantial Evidence of Age Discrimination**

i.     <u>Sanders' Ranking</u>

119.     Sanders challenges her ranking because, in her opinion, she was on a "promote list," she did have field or technical skills, and she was unfairly penalized for lack of productivity.

•     Wooten testified that he was aware that Sanders believed that she was eligible for promotion because Sanders had mentioned it to him on one occasion.  Wooten Testimony, Tr. at 440-41.   Sanders testified that in March or April 2001, Boleman told her that she had "obtained" a second-level position, but he could not "let her go."  Sanders Testimony, Tr. at 727-28.  In fact, Boleman testified that in 2001 he received a phone call from the Security Department asking to interview Sanders for an Area Manager position.  Boleman Testimony, Tr. at 855, 873.  Boleman responded that he would be unable to release Sanders because of a shortage of design engineers.  <u>Id.</u>  at 856, 874.  Boleman relayed the conversation to Sanders and told her that he was sorry.  <u>Id.</u>  at 856.  Another design engineering manager, Kaylan

Collins, was sitting at a table with Sanders, when Boleman approached and told Sanders that she was eligible for promotion to second-line manager. Collins testified that Boleman told Sanders that he told the other division that they could not have her. Collins Testimony, Tr. at 255. Boleman testified that he told Sanders' second-line manager, who he thought was Wooten, that he had received a call about the interview. Boleman Testimony, Tr. at 856-57. Boleman did not direct Wooten to place Sanders on a "promote list." Id. at 874. Boleman testified that there were managers he would have promoted ahead of Sanders. Id. Sanders alleges that she should have been on a "promote list" and her potential for promotion should have been considered at the ranking meeting. However, Wooten testified that he was aware that Sanders believed that she was due for a promotion. The Court finds that whether Sanders was or should have been on some promote list is irrelevant to the issue of whether age was used as a factor in the Fall 2002 RIF.

• Sanders also contends that she had technical skills and did not receive fair consideration of those skills. She testified that her field experience and technical skills included: meeting people in the field, trouble-shooting, and filling in for Steve Hartley (first-line hi-cap manager) when he was on vacation. Sanders Testimony, Tr. at 803-04, 808. Sanders admitted, however, that the hi-cap job did not require technical skills. Id. at 807; see also Harris Affidavit, Plaintiff's Ex. 10, at 5. Rick Hawkins, in his deposition, testified that Sanders would ask him to verify that the way she handled a project was correct and she asked Hawkins questions regarding his "experience and knowledge of services they provided." Hawkins Deposition,

34

Joint Ex. 1, Dkt. # 357, at 9.  Sanders alleges that her technical skills were more than adequate to perform her job.  However, the Court finds that all of the Area Managers testified that Sanders lacked the technical skills of the managers who were ranked above her.

•      Sanders further alleges that she was not given credit at the ranking meeting for her education and training.  However, it is clear to the Court that Sanders' education was discussed at that meeting because Area Managers, who did not supervise her, were aware of her degree.  In addition, Sanders' cable splicing training was likely considered because it is noted on the performance evaluation that served as the basis for her placement in Band C.

•      Finally, Sanders suggests that she was penalized for lack of productivity because she was working on "training" and demand team responsibilities.  However, Wooten testified that managers were often given projects other than their regular work and they were not "penalized" for doing so.  Wooten Testimony, Tr. at 267-68, 448.

The Court finds no evidence that Sanders' age had an effect on her ranking.  While she may disagree with how she was ranked, this is not circumstantial evidence of age discrimination.  Further, the Court finds that Sanders' ranking was supported by legitimate business considerations and was not pretextual.

        ii.      <u>Rick Griffith</u>

120.      The Court finds that there is nothing discriminatory to be inferred from Griffith's decision to accept a first-line manager position.  <u>See also</u> <u>Sanders</u>, 544 F.3d at 1109-10 (finding that

Griffith's "voluntary demotion" did not provide evidence of pretext).  The court credits Griffith's testimony that he chose to take the engineering position rather than the construction position because he felt more comfortable in the former.  Griffith Testimony, Tr. at 612.  This provides no circumstantial evidence of age discrimination.

       iii.     <u>Other Employees in C&E</u>

121.    **Paula Henderson** (year of birth 1955) was an engineering design manager in Ardmore, Oklahoma.  McNeely Testimony, Tr. at 229.  She was not surplussed because she got a position in the OPTI division.  <u>Id.</u> at 197-08, 229-30. The OPTI division is outside of C&E and was not in McNeely's chain of command.  <u>Id.</u> at 230.  When Henderson accepted the OPTI position, the pool of at-risk engineers in Ardmore was reduced by one.  <u>Id.</u>  Sam Porter (date of birth 3/12/53) was at risk for surplus, but took Henderson's position when she left.  <u>Id.</u> at 230-31; Defendant's Ex. 45; Defendant's Ex. 121A.

122.    **Jim Wood** (year of birth 1952) was surplussed in the Fall 2002 RIF.  Defendant's Ex. 121A;  Wood Testimony, Tr. at 764.  Wood worked out of the Tulsa office.  Wood Testimony, Tr. at 763.  His Area Manager, Ray Hanson, told him that he was being surplussed and he responded that he would "let the judicial system figure out why."  <u>Id.</u> at 764.  Wood applied for a job with OPTI in Tulsa and was selected.  <u>Id.</u> 765-66; Defendant's Ex. 45.

123.    **Leedell Wheeler** (year of birth 1953), Manager-Construction, retired prior to the Fall 2002 RIF.  McNeely did not know whether her retirement provided a position for David Land (date of birth 8/27/61) in Muskogee. McNeely Testimony, Tr. at 173-77.

124.    **Cathy Skapka Estes** (year of birth 1952) was an SWBT engineering design manager who was surplussed in the Fall 2002 RIF.  Estes Testimony, Tr. at 18-20.  Estes spent the majority

of her career at SWBT in marketing and communications; she had only two years experience as a design engineer. Id. at 18-20, 37. At the time of the Fall 2002 RIF, Estes was one of three hi-cap managers in Oklahoma, and she reported to Vahle. Id. Estes received a 20 on her performance evaluation because she was competent and met objectives, but was not performing above the average level that was expected of a first line manager. Vahle Testimony, Tr. at 583. Wooten testified that Estes had little or no technical skills and, as a result, anyone could do her job, but she could not do anyone else's job. Wooten Testimony, Tr. at 355. When asked why an area manager would write "inexperienced" was next to her name, Vahle testified that Estes was inexperienced despite twenty years at SWBT because she had been in engineering for a short time and was experienced in the DS-1 (hi-cap) job function only. Vahle Testimony, Tr. at 568. Estes was ranked 16 out of 17 by the Area Managers. Defendant's Ex. 12. McNeely testified that after he received the rankings he was surprised to see that Estes was ranked near the bottom. McNeely Testimony, Tr. at 183, 221. He asked Amy Elliott about Estes' ranking, and Elliott explained that Estes did not have enough experience or skills as a design engineer despite many years of experience in marketing. Id. at 183, 222. Estes contends that Vahle told that her "position" would be eliminated and it was a "business decision." Estes Testimony, Tr. at 21, 32. McNeely testified that "positions" were not eliminated; rather, people were eliminated. McNeely Testimony, Tr. at 73, 188-89. Estes then learned that another manager, **Bryan Brown** (year of birth 1968), would be taking over her responsibilities. Estes Testimony, Tr. at 27; Defendant's Ex. 121A. Wooten testified that he provided candidates to Amy Elliott to assume Estes' responsibilities and he recommended Brown because of his hi-cap experience. Wooten Testimony, Tr. at 384-85. Amy Elliott selected Brown. Id. Estes testified that she was asked to train Brown, which she refused to do. Estes Testimony, Tr. at 27, 36, 41.

37

According to Estes, Brown had worked in engineering as a central office person had had been with the company just a few years. Id. at 28. However, Wooten testified that Brown had hi-cap experience as part of the demand team. Wooten Testimony, Tr. at 368. Vahle testified that Brown also had experience in designing special circuits and was placed in Band B for the Fall 2002 RIF. Vahle Testimony, Tr. at 557-58. Brown was rated "above average." Plaintiff's Ex. 67. Estes testified that she believes she was surplussed because of her age, but admitted that neither Vahle nor McNeely told her that she was surplussed because of her age. Estes Testimony, Tr. at 32, 42. The Court finds that Estes was surplussed on the basis of her lack of experience and technical skills, and not on the basis of age.

125. **Rick Hawkins** (year of birth 1952) did not receive comments that he was above average, superior, or below average, resulting in a 20 rating. See Plaintiff's Ex. 35. Wooten testified that, despite Hawkins' many years of experience as an engineer, there were complaints from the construction group that Hawkins' work prints and orders were not sufficiently detailed. Wooten Testimony, Tr. at 310. According to Wooten, an employee with less experience, but superior or above average performance, can earn a higher rating than a manager with more experience but less impressive performance. Id. Nonetheless, Hawkins was not surplussed. See Hawkins Deposition, Joint Ex. 1, Dkt. # 357, at 4.

126. **Butch Miller** (year of birth 1953), a first level manager, was moved into Wooten's group after the Spring 2002 RIF. Wooten Testimony, Tr. at 411-12. According to Wooten, Miller was moved to engineering as punishment for misconduct in the construction group. Id. at 413-14. The decision was made by McNeely, Wooten, and Harris. Id. at 414. Miller was put on a Performance Improvement Plan (PIP), which was completed by the Fall 2002 RIF. See Plaintiff's

Ex. 31, Defendant's Ex. 88.  Miller had previous engineering experience, so Wooten asked Sanders to help Miller with administrative skills and had Miller work with Sanders in the field with technical skills.  Wooten Testimony,  Tr. at 422; Defendant's Ex. 88.  Sanders testified, however, that she helped Miller with his technical skills in the field. Sanders Testimony, Tr. at 835-36.  Harris stated that Miller had an "outside construction background" and was able to "independently complete jobs."   Harris Affidavit, Plaintiff's Ex. 10, at 4.   According to Harris, "Sanders was not as autonomous." Id.  The Court finds it is more credible that Miller helped Sanders with her technical skills.  Sanders had less outside experience than Miller, who had been in engineering and construction.  Accordingly, it does not seem likely that Miller needed Sanders to help him with his technical skills.

127.   **Debra Denise Tigert** (year of birth 1955) received a 30 rating despite a lack of comments in her evaluation.  See Defendant's Ex.12; Plaintiff's Ex. 46.  Wooten testified that it is possible that her rating was raised prior to the Fall 2002 RIF.  Wooten Testimony, Tr. at 486.

128.   **Toni Jean Tatum** (year of birth 1954) was a design engineer in Tulsa who was surplussed in the Spring 2002 RIF after receiving a below average performance rating (10).  Tatum Testimony, Tr. at 497, 505.  Tatum claims that her supervisor, Ray Hanson, did not help her find another position.  Id. at 499.  However, she admitted that her only proof of this was that she applied for 53 jobs within the company and only heard back from the one job that Hanson did not know she had applied for.  Id.  Tatum testified that she believes her surplus was the result of her age, but conceded that she had no evidence of age discrimination.  Id. at 499-500.  She also acknowledged that James Schoolfield (year of birth 1952), David Edgar (year of birth 1953), Dee Downey (year

of birth 1952), and Douglas Elliot (year of birth 1951) are all older than she is, but were retained. Id. at 506-09; Defendant's Ex. 121A.

129.    **Jesse Webb** (year of birth 1976), a surplussed first line manager, did not "relocate," but changed jobs within the same office.  Vahle Testimony, Tr. at 528.  Webb did not receive a surplus notice because he was the highest ranked at-risk manager and when Marsha Wiseman's position opened, Webb got it.  Id. at 529; Defendant's Ex. 68/Plaintiff's Ex. 55.  McNeely made the decision to put Webb in that position.  Vahle Testimony, Tr. at 529.  Vahle testified that Sanders was not eligible for the Webb position because it would have required relocation.  Id. at 586.

130.    **Denise Coffey** (year of birth 1957) testified that several younger employees from the now-disbanded "Project Pronto" were moved to new positions prior to the RIF and were not surplussed.  Coffey Testimony, Tr. at 773-79.  The managers who were moved to new positions were ranked higher than Coffey.  McNeely Affidavit, Plaintiff's Ex. 5, at 2.  Coffey testified that she was told that SWBT had too many first-line managers and they had to surplus 24 managers.  Coffey Testimony, Tr. at 774.  Although Coffey denies that Harris counseled her, see id. at 779, Harris stated in his affidavit that Coffey was ineffective and he had counseled her on complaints about her work.  Harris Affidavit, Plaintiff's Ex. 10, at 3.

131.    **Karie Brooks** (year of birth 1946) first became a design engineer in November 2001.  Brooks Deposition, Joint Ex. 2, Dkt. # 358, at 70.  Brooks testified that she had no facts to dispute SWBT's assertion that employees were grouped based on location and job function and then ranked accordingly.  Id. at 79.  Brooks testified that Wooten showed her the ADEA information and told her that "HR did it this way to prevent discrimination."  Id.  Brooks believed that "HR" surplussed her because of her age.  Id.  However, Brooks conceded that Wooten never expressly told her that

she was surplussed because of her age, and that was only her "impression." Id. at 89. Brooks testified that Wooten said, in response to her comments about subjectivity, that "[t]here's no way to get away from the subjectivity." Id. The Court finds that Wooten's alleged statement is benign and consistent with the purposes of the ADEA. Rather than providing evidence of age discrimination, Brooks' testimony regarding the surplus notification meeting corroborates Wooten's testimony that he did not tell Sanders that she was surplussed on the basis of her age.[18]

132.    **Maria Flatt**, a staffing manager in the employment office, applied for an engineering job and was interviewed by Wooten before July 2001. Flatt Testimony, Tr. at 750-51. Flatt testified that at the interview Wooten asked her about her plans to retire. Id. Flatt had been with SWBT for over thirty years and SWBT employees are allowed to retire after thirty years of service, regardless of age. Id. at 753. Flatt testified that she did not think Wooten's question was about her age, and thought instead that it was a question about how long she planned on staying at the company. Id. at 755. Flatt assumed that she did not get the position because of her lack of experience and had no facts suggesting that her age was the reason for her non-selection. Id. Flatt never heard Wooten make an age-related comment about an employee. Id. at 756. Flatt did not recall telling Sanders that she had a feeling that she did not get the job because of her age. Id. at 752, 759. Sanders testified that Flatt told her that asking about retirement plans is the same as asking about age. Sanders Testimony, Tr. at 831. The Court finds that Wooten's question to Flatt more than a year earlier regarding her plans to retire, while perhaps inartfully worded, was not age-related and is not

---

[18]    Brooks' complaint that her alleged eligibility for promotion was not included in her 2001 performance evaluation, see Dkt. # 371, at 23, is irrelevant and not evidence of age discrimination in the Fall 2002 RIF.

circumstantial evidence of discriminatory intent.  The Court further finds that Flatt's recollection of her own reaction to her conversation with Wooten is more reliable than Sanders' recollection.

133.    The Court finds that none of the evidence regarding the ages and employment of these other employees provides any evidence of age discrimination in the Fall 2002 RIF.  Some employees who were retained were older than plaintiff, and there is nothing to indicate that SWBT did not follow its own rules or somehow applied its rules inconsistently among different employees.

134.    The Court finds, based on all the evidence, that age played no role in the SWBT Fall 2002 RIF decisions; the decisions were based on legitimate business criteria.

## II.    CONCLUSIONS OF LAW[19]

### A.    Jurisdiction, Venue, and Parties

1.    This action originally arose under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, as amended, et seq. (Title VII) and the Age Discrimination in Employment Act (ADEA), and this Court had subject matter jurisdiction based on 28 U.S.C. § 1331.

2.    After plaintiff's federal claims were finally adjudicated against her or voluntarily dismissed, the Court exercised its discretion to retain supplemental jurisdiction (Dkt. # 268), pursuant to 28 U.S.C. § 1367, over a pendent state law claim.  See Arbaugh v. Y&H Corp., 546 U.S. 500, 514 (2006); United Int'l Holdings, Inc. v. Wharf (Holdings) Ltd., 210 F.3d 1207, 1220 (10th Cir. 2000) ("Once federal question jurisdiction exists, it is within the trial court's discretion to exercise supplemental jurisdiction over those state law claims that derive from a common nucleus of facts.").

---

[19]    Any finding of fact more appropriately characterized as a conclusion of law is incorporated herein.

3.      All of the acts and omissions alleged occurred within the State of Oklahoma. Defendant does business in Tulsa, Oklahoma, which is in the Northern District of Oklahoma. Thus, venue is proper pursuant to 28 U.S.C. § 1391(b)(1) and (c).

4.      The Court lacks personal jurisdiction over SBC because Sanders failed to serve SBC as required by Fed. R. Civ. P. 4(c)(1), and Sanders has not shown good cause for her failure to serve SBC.

5.      Plaintiff's motion to vacate the dismissal of SBC (Dkt. # 279) should be denied. First, there was no proper service of process. A plaintiff must serve a defendant with a summons and a copy of the complaint within 120 days after the filing of the complaint. Fed. R. Civ. P. 4(m). For the reasons stated above, SBC was never properly served. See supra. If service is not made within 120 days, the district court, "on motion or on its own after notice to the plaintiff[,] must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Id. Second, there was more than adequate notice to plaintiff that SBC was not properly served, including this Court's earlier opinion dismissing SBC and the Tenth Circuit's opinion. See Dkt. ## 145, 196. Third, since remand, plaintiff has taken inconsistent positions with regard to SBC as a party: plaintiff first dismissed SBC without prejudice (Dkt. # 204); then plaintiff withdrew the dismissal and agreed to the dismissal in the same hearing, then filed a notice of dismissal with prejudice (Dkt. # 244), and the Court entered an order of dismissal of SBC with prejudice on June 8, 2009. On June 23, 2009, plaintiff filed a letter (Dkt. # 279), which the Court construed as a motion to vacate the dismissal of SBC. The Tenth Circuit recently held that "a voluntary dismissal with prejudice operates as a final adjudication on the merits, and is thus a final judgment." Schmier v. McDonald's LLC, 569 F.3d 1240, 1242 (10th Cir. 2009) (internal citation

and quotation marks omitted).  In <u>Schmier</u>, the plaintiff voluntarily dismissed his case with prejudice and then "changed course" and sought to vacate the dismissal.  <u>Id.</u> at 1241.  The Tenth Circuit held that plaintiff was not entitled to relief from final judgment under Federal Rule of Civil Procedure 60(b) because he failed to demonstrate that such relief was warranted.  <u>Id.</u> at 1243.  Pursuant to Rule 60(b), relief from final judgment is warranted where there was "mistake, inadvertence, surprise, or excusable neglect," or where there is "newly discovered evidence that, with reasonable diligence, could not have been discovered in time . . . ."  Fed. R. Civ. P. 60(b).  Here, plaintiff failed to state any reason why the dismissal with prejudice of SBC should be vacated.  Plaintiff, who was <u>pro</u> <u>se</u> at the time, stated only that she believed that she "had to" dismiss SBC because the Court told her that there was no proper service.  Dkt. # 279.  Once plaintiff's counsel entered an appearance, counsel was directed to review the SBC issue and advise the Court how plaintiff intended to proceed.  Without providing a reason why the dismissal of SBC should be vacated, plaintiff's counsel advised the Court that plaintiff did not wish to withdraw her motion to vacate the dismissal. Accordingly, plaintiff has offered no basis to vacate her voluntary dismissal with prejudice of SBC. <u>See</u> <u>Schmier</u>, 569 F.3d at 1243.  The Court concludes that after six years, plaintiff should not be permitted, on the eve of trial, to change course as to her voluntary dismissal of SBC.  Plaintiff's litigation conduct resulted in excessive delay and uncertainty as to whether SBC was a party, and it would be prejudicial to SBC to bring it into the litigation on the eve of trial.  Plaintiff's motion to vacate the dismissal of SBC with prejudice (Dkt. # 279) is denied.

B.    Oklahoma <u>Burk</u> Torts

6.    The Oklahoma Anti-Discrimination Act (OADA), OKLA. STAT. tit. 25, § 1101 <u>et seq.</u>, clearly articulates Oklahoma's public policy against discrimination.  The OADA reflects the public policy statement that forms the basis for plaintiff's <u>Burk</u> tort action.

7.    In <u>Burk v. K-Mart Corp.</u>, 770 P.2d 24 (Okla. 1989), the Oklahoma Supreme Court recognized a limited exception to the at-will employment doctrine and permitted a discharged employee to pursue a tort claim if she "is discharged for refusing to act in violation of an established and well-defined public policy or for performing an act consistent with a clear and compelling public policy."  <u>Id.</u> at 29.

8.    Because the OADA provides a remedy for individuals who were discharged on the basis of a physical disability only, a <u>Burk</u> tort is available to all other individuals in the class of employment discrimination victims.  <u>Collier v. Insignia Fin. Group</u>, 981 P.2d 321, 326 (Okla. 1999).

9.    In response to a certified question from this Court, the Oklahoma Supreme Court confirmed that the OADA created a unified class of individuals who are the victims of "handicap, race, gender, or age discrimination," and equal remedies are required for all such individuals.  <u>Saint v. Data Exch., Inc.</u>, 145 P.3d 1037 (Okla. 2006).

10.    Until recently, <u>Burk</u> tort claims were unavailable when an employee, who would otherwise fall into the class of employment discrimination victims, had an "adequate" federal or state statutory remedy.  <u>Clinton v. State ex rel. Logan County Election Bd.</u>, 29 P.3d 543 (Okla. 2001).  The court held that "the existence of a federal statutory remedy that is sufficient to protect

Oklahoma public policy precludes the creation of an independent common law claim based on a public policy

exception to the employment-at-will doctrine." Id. at 546.  See Vasek, 186 P.3d at 933 (equating "adequacy" with "sufficiency").

11.     The Oklahoma Supreme Court recently revisited the issue of adequacy in two cases, Kruchowski v. Weyerhaeuser Co., 202 P.3d 144 (Okla. 2008), and Shirazi v. Childtime Learning Ctr,, Inc., 204 P.3d 75 (Okla. 2009).

12.     In Kruchowski, the court confirmed that a plaintiff may pursue a Burk tort claim "when the available remedies to the same class of employment discrimination victims are not uniform and evenhanded – regardless of whether the remedies originate under Federal or State law," and determined that the standard is no longer whether the federal or state remedy is "adequate," but whether it is "commensurate"[20] with the remedy provided for similar work-related discrimination. Kruchowski, 202 P.3d at 153.

13.     In Shirazi, the United States District Court for the Western District of Oklahoma certified two questions to the Oklahoma Supreme Court seeking to clarify whether the remedies available under the ADEA and Title VII are adequate, such that a Burk tort would be unavailable. Shirazi, 204 P.3d at 76 n.1.  In response, the Oklahoma Supreme Court reiterated that the proper inquiry, after Kruchowski, is no longer whether the remedies provided are adequate. Id. at 79. However, the court in Shirazi did not consider whether the remedies were commensurate, but whether they were the same. Id. at 78.  According to Shirazi, a plaintiff must show that the

---

[20]     Webster's Dictionary defines "commensurate" as "equal in measure or extent." WEBSTER'S COLLEGIATE DICTIONARY 231 (10th ed. 1994).

"statutory remedy in existence is not the <u>same</u> as those provided for work-related discrimination within the same employment class." <u>Id.</u> (emphasis added).

14.     A <u>Burk</u> tort is thus sustainable only when the available remedies under federal or state law are either not "commensurate" with or not the "same" as the remedies provided for like or similar discrimination.  <u>See</u> <u>Kruchowski</u>, 202 P.3d at 153; <u>Shirazi</u>, 204 P.3d at 78.

15.     A plaintiff's <u>Burk</u> tort claim will succeed or fail for the same reason as the related federal claim.  <u>See</u> <u>Melton v. Farmers Ins. Group</u>, 619 F. Supp. 2d 1131, 1142 (W.D. Okla. 2008) (plaintiff's <u>Burk</u> tort claim fails for the same reason plaintiff's federal claim fails); <u>Tatum v. Philip Morris Inc.</u>, No. 93-6018, 1993 WL 520983, at *3 (10th Cir. Dec. 14, 1993) (recognizing that plaintiff's gender-based Burk tort parallels a federal gender discrimination claim).

16.     The elements of a <u>Burk</u> tort claim were recently articulated by the Oklahoma Supreme Court as: "(1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal."  <u>Vasek v. Bd. of County Comm'rs of Noble County</u>, 186 P.3d 928, 932 (Okla. 2008).

17.     In a recent decision, the Supreme Court held that, under the ADEA, age must be the "but-for" cause of the employer's adverse employment action.  <u>Gross v. FBL Fin. Svcs.</u>, Inc., 129 S. Ct. 2343, 2350 (2009).  However, this Court need not reach the question of whether the OADA also requires age to be the "but-for" cause of the employer's adverse employment action because

the Court has found that there is no evidence that age was any cause of plaintiff's discharge from SWBT.  See infra.

### C.      Plaintiff's Age Discrimination Claim under Burk

18.      Plaintiff has proven the first two elements of a Burk tort, as she was discharged from her job with SWBT and she was an at-will employee.  See Vasek, 186 P.3d at 932.  However, the Court concludes that plaintiff has failed to present any direct evidence that age was a "significant part"[21] of the reason for her discharge.  Id.

19.      As to circumstantial evidence that age was a factor in the surplussing decision, the Tenth Circuit held, as to Coffey and Brooks, that their circumstantial evidence of pretext was insufficient to show age discrimination.  Sanders, 544 F.3d at 1106.  Generally, "[a] plaintiff demonstrates pretext by producing evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."  Id. (citing Jaramillo v. Colo. Judicial Dep't, 427 F.3d 1303, 1308 (10th Cir. 2005)).  When a plaintiff is surplussed as a result of a RIF, plaintiff may present evidence that, inter alia, her surplus is inconsistent with the stated RIF criteria, the criteria were applied inconsistently, or there were procedural irregularities in the RIF process.  See id. at 1106-07.

---

[21]      Because plaintiff cannot show that age was a "significant part" of the reason for her discharge, she certainly cannot show that age was the "but-for" cause of her discharge.  See Gross, 129 S. Ct. at 2350.

20.     On appeal, it was argued that low band placement was evidence of pretext if the employee's performance should have been rated "superior" or "above average."   Id. at 1107. However, the Tenth Circuit held that "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." Id. (citing Furr v. Seagate Tech., Inc., 82 F.3d 980, 988 (10th Cir. 1996)).

21.     The Tenth Circuit also held that the explanations given for the rankings were consistent with the RIF policy and the evidence did not support the contention that the RIF criteria were inconsistently applied by the Area Managers.  Id. at 1108.

22.     The Tenth Circuit further held that tenure as an engineer was "only one of many possible ranking criteria," and rejected the argument that SWBT failed to consider length of time in the design engineering position.  Id. at 1109.  The Tenth Circuit further held that SWBT did not deviate from its stated RIF policy.  Id.

23.     This Court also concludes, based on all the evidence at trial, that there was no evidence of pretext in the Fall 2002 RIF and concludes that there is no circumstantial evidence of pretext as to Sanders' age discrimination claim.

24.     Thus, plaintiff has failed to prove the third element of her Burk tort claim -- that age was a significant part of the reason for her discharge. Therefore, the Court concludes that SWBT has not violated Oklahoma public policy related to age and is entitled to judgment.

**IT IS THEREFORE ORDERED** that plaintiff's motion to vacate (Dkt. # 279) is **denied**.

**IT IS FURTHER ORDERED** that, in accordance with these Findings of Fact and Conclusions of Law, a judgment shall be and herewith is entered for SWBT and against plaintiff.

**IT IS FURTHERED ORDERED** that, because judgment is entered in favor of defendant, there will be no damages phase of the non-jury trial.  Accordingly, defendant's Motion to Exclude Evidence of Damages for Failure to Comply with Rule 26 (Dkt. # 340) is **moot**.

**DATED** this 28th day of October, 2009.

CLAIRE V. EAGAN, CHIEF JUDGE
UNITED STATES DISTRICT COURT